**Michael D. Zoldan- 028128**
**SHIELDS PETITTI & ZOLDAN, PLC**
mdz@shieldspetitti.com
docket@shieldspetitti.com
5090 N 40th St, Suite 207
Phoenix AZ 85018
Tel: (602) 718-3330

**Thomas Newkirk**
**NEWKIRK ZWAGERMAN, P.L.C.**
tnewkirk@newkirklaw.com
IA Bar No.  AT0005791
3900 Ingersoll Ave, Suite 201
Des Moines, IA  50312
Tel: (515) 883-2000
*Pro Hac Vice Forthcoming*

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sanja Tomasevic,<br><br>              Plaintiff,<br><br>        vs.<br><br>Arizona State University, a State University;<br>Board of Regents, an Arizona corporation, an<br>Agency of the State of Arizona,<br><br>              Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**(Violations of Title VII Including Claims of Unlawful Segregation)**<br><br>**Jury Trial Requested** |

**COMES NOW** the Plaintiff, Sanja Tomasevic, by and through her attorneys, and for

her causes of action, hereby states the following:

1407424.1

## **INTRODUCTION AND SUMMARY OF CLAIMS**

1.      Plaintiff Sanja Tomasevic ("Coach Tomasevic" or "Tomasevic") brings this action against the Defendant Arizona State University ("ASU") for pay discrimination, a hostile work environment, gender discrimination and retaliation causing damages resulting from the loss of her job and college coaching career in violation of her rights under federal law.

2.      This is an action brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. (hereinafter "Title VII").

3.      Plaintiff Sanja Tomasevic also alleges that Arizona State University participates in the nationwide practice of illegal segregation or limitation of the hiring and retention of female coaches in violation of 42 U.S.C. § 2000e-2(a)(2).

4.      Plaintiff alleges that ASU engaged in pay discrimination under Title VII. Coach Tomasevic was required to do more work under more pressure for the same or less money paid to male coaches (of any team) when compared to male coaches of women's volleyball or coaches of men's teams. This added work was required because of her sex.

5.      Coach Tomasevic was forced to work under the added pressure and double standards generated by commonly held gender stereotypes in the athletes and parents. These stereotypes added additional "work" to Coach Tomasevic's job in the form of differential expectations, added pressure, and invalid complaints about the efforts and ability of Coach Tomasevic to manage her program. In addition, Coach Tomasevic faced the added burdens imposed by the stereotypes in those working in the athletic administration at ASU:

Stereotypes that created additional expectations on female coaches and that caused the administration to respond differently to complaints made by a female team than to complaints made by male teams; stereotypes that placed expectations on a female coach to manage the emotions and perceptions of her team. Coach Tomasevic was, because of the effects of stereotyping, required to do more "work" for less pay than males because of her gender and/or the gender of her team.

6.     Plaintiff alleges pay discrimination. Coach Tomasevic was paid less than the sum offered to her male replacement to do the same job while requiring him to engage in less work (more support, staff, and without double standards of stereotypes). Coach Tomasevic's male replacement also had far less experience than she did.

7.     Coach Tomasevic was subjected to a hostile work environment caused by altered working conditions brought about by the extra work, pressure, and double standards placed on Plaintiff as a result of unmanaged gender stereotypes resulting from ASU's participating in the industry-wide practice of illegal gender segregation.

8.     For all claims - hostile environment, wrongful discharge, equal pay, and retaliation - Coach Tomasevic challenges decisions as motivated by her gender, via negligence, as resulting from a policy or practice resulting in disparate impact and forming part of a pattern and practice of discrimination.  For each cause of action Coach Tomasevic brings claims for herself as an individual, but also for other women similarly impacted by the negative effects of segregation and stereotypes.

9.      **Plaintiff brings this claim to challenge ASU's participation in the nationwide practice that burdens women in athletics with the effects of stereotypes. Plaintiff seeks an injunction that orders ASU to change its training, recruiting, and hiring practices to be the first in the domino-falling process required to eliminate the last bastion of illegal segregation in the United States.**

### Illegal Segregation as Per Se Evidence of Stereotypes and Negligence

10.     College athletics, unlike any other industry in the United States, remains illegally segregated. Female employees (coaches) are *segregated* in the sense they are effectively prohibited from coaching men and are *limited* to coaching only a certain percentage of other women. Men are permitted to coach all other men and fully embraced in coaching women.

11.     Only allowing female coaches to coach women and/or the limitation on the number of female head coaches in women's athletics is a form of illegal segregation, in violation of 42 U.S.C § 2000e-2(a)(2).

12.     The segregation (which we challenge as a violation of federal law) is the formerly *de jure* and currently *de facto* segregation of female *coaches* from male coaches with respect to eligibility for specific coaching positions, as well as the resulting differential treatment and expectations based on gender.

13.     *De jure* segregation occurs when a university openly acknowledges that women cannot or may not be able to coach men.  Such beliefs result from the commonly held gender stereotype that men are better coaches generally or that male athletes would not listen to or

4

respect a female coach. Colleges and universities engaged in *de jure* segregation up to and for some period of time after the passage of Title IX.

14.     *De facto* segregation occurs when a university, through its standard operations or practices, permits, enables, or enforces illegal segregation and places systemic limitations on hiring women as a matter of fact, regardless of any formal policy or openly stated belief. The decisions that cause a university to sit back and permit, enable, or enforce illegal segregation are driven by gender stereotypes regarding women's ability to coach and their appropriate role in coaching in athletics. Today, most universities practice *de facto* segregation of women.

15.     In Arizona, as evidenced by data collected under the Equity in Athletics Disclosure Act ("EADA"), every major public university engages in this *de facto* segregation.

16.     EADA data show that at Arizona State University, there are ZERO female coaches coaching men's teams out of a total of nine available positions, yet eight male coaches coach women's teams out of a total of thirteen. Furthermore, there are three female assistant coaches of men's teams out of forty available jobs, while there are twenty-seven male assistant coaches of women's teams out of a total of forty-one.

17.     EADA data show that at Northern Arizona University, there are ZERO female coaches coaching men's teams out of a total of four available positions, yet five male coaches coach women's teams out of a total of seven. Furthermore, there is one female assistant coach of men's teams out of twenty-two available jobs, while there are nine male assistant coaches of women's teams out of a total of sixteen.

5

18.     EADA data show that at the University of Arizona, there are ZERO female coaches coaching men's teams out of a total of nine available positions, yet seven male coaches coach women's teams out of a total of twelve. Furthermore, there are six female assistant coaches of men's teams out of forty available jobs, while there are eighteen male assistant coaches of women's teams out of a total of thirty-four.

19.     Segregation in college athletics is reminiscent of other historical injustices. The *de facto* segregation of Black people in the United States long after segregation became illegal caused similar levels of harm and legitimized and entrenched false stereotypes about Black people. Racial segregation is referenced as it is the only example of a form of segregation of sufficient power to explain the circumstances surrounding the creation of segregated systems, the continued power of stereotypes to cause harm to the segregated group, and how some of the systemic mechanisms that act to maintain *de facto* segregation came about long after legally sanctioned (*de jure)* segregation became illegal.

20.     Just as in athletics today, during the time of *de jure* and later the continued *de facto* segregation of Black Americans, thousands of organizations permitted and enforced policies and practices that legitimized and entrenched segregation. Consequently, the segregated group (Black people) was prohibited from working in positions traditionally held by the group enforcing segregation (whites). This included a host of jobs (professional, political, and other leadership roles). Just as in our racially troubled past, today, the effects of *de jure* and later *de facto* segregation in athletics legitimize false and harmful stereotypes about women that prevent women from being hired to coach men. That arbitrary limit leads

6

to a corresponding limit on how many women are hired to coach other women and places added burdens (extra work) on women acting the role of head coach.

21.     Today, *de facto* gender segregation exists in every university in the United States. Its continued enforcement is the result of the failure to recruit, consider, or encourage the hiring of females for head and assistant coaching positions for male programs, as well as the result of actively recruiting and hiring men to coach women at equal or higher rates as their female coach counterparts, resulting in a corresponding limitation on women coaching women: less than 45% of women's athletic teams are coached by women.

> Statistics from the NCAA (2004) and from the Acosta and Carpenter longitudinal study (2006) show no change over the last several decades in the percentage of women coaching men's collegiate sport teams (2-3%). Data also shows that less than 43% of women's teams are coached by women and over 57% are coached by males.

Acosta/Carpenter, *Women in Intercollegiate Sport: A Longitudinal, National Study, Thirty Seven Year Update,* (2014).

22.     Statistics demonstrating that few women are permitted to coach men and the limitation on women coaching women have remained unchanged for the last 30 years. The percentage of women coaching other women has been locked at under 45% since at least 1994. That figure remains largely unchanged in 2025.

23.     Women are only permitted to coach men in very limited circumstances, most often as part of a dual program where men's and women's programs are combined under one coach, as part of a much smaller school, or occasionally as a public experiment.  No university

in the United States, including ASU, has taken substantive, affirmative steps to recruit or hire females to coach men in a manner equivalent to the way men are fully encouraged to coach both men and women.

24. Universities, including ASU, provide men with equal (and often greater) opportunities (recruiting and hiring) to coach women and exclusive opportunities to coach men. Every university embraces or enforces this illegal segregation by silent acceptance or by its own common hiring practices. Every university also enforces illegal segregation and limitations on women's coaching by participating in or silently accepting gender stereotyping.

25. As explained in this Complaint, the exclusion of women from coaching men and the limitation on women coaching women continues to be enforced via several overlapping forces, outlined as follows:

- First, segregation in athletics was created by and now perpetuates stereotypes that women are not as effective at coaching as men. Segregation can only continue (remain enforced) if a hefty portion of the populus holds a common belief in the same harmful stereotypes that created the segregation in the first place. These stereotypes (that men are stronger leaders/coaches, that women must exhibit feminine traits to be liked etc.) exist in the majority of society and are particularly impactful in college and professional sports, which have traditionally been a very male-oriented field.

- Second, segregation maintains itself partially by means of the harmful impact segregation has on the segregated group. Women considering the profession of coaching can easily observe that they are not permitted to coach men and limited to coaching less than 45% of women. This negatively impacts women's interest in pursuing coaching positions, as well as their ability to have long-lasting coaching careers. Women, like men, are socialized with an implicit understanding that they will not be considered able to coach by the team, by administration, and by the fan base. Women will not even apply for positions to

8

coach men because they tacitly and subconsciously understand how deeply this stereotype is systemically entrenched.[1]

- Third, the effects of stereotypes harm women who are fortunate enough to get through all of the initial barriers of segregation and get hired as head coaches. As this complaint shows, women like Coach Tomasevic are required to do more work to manage and offset the effects of stereotype-driven double standards, for far less money. Also, as with Coach Tomasevic, over the last twenty years the effects of unmanaged stereotypes harbored by athletes, parents, and administration have accelerated. Women receive a far greater number of unsubstantiated complaints and are often fired for them, despite the fact that they are doing extra work to try and stop these complaints and have engaged in no improper coaching methods that would justify these complaints or termination as a result of these complaints, especially when compared to her male counterparts, who often use more "aggressive" or "authoritarian" coaching styles, often while getting fewer complaints from athletes and almost always while getting support from university administrations.

- Finally, once a woman is fired from her coaching position for some type of alleged wrongdoing, no other university will touch them. This cyclical process of simply treading water, trying to bridge the gap between "feminine" and "masculine" coaching styles to address baseless complaints, limits the number of women interested in being hired to coach women and excludes them from coaching men. It places added work and increased burn-out on those women who are able to retain their head coaching position. It creates a high risk of being forced out because of stereotype-driven complaints. It then precludes a woman who has been forced out or fired from being rehired, thereby opening up her position for either a female who will be subjected to the same negative forces or a male.

---

[1] The impact of internalized and socialized segregation was thoroughly investigated in *Brown v. Board's* famous doll test. In those experiments, a majority of African American children showed a preference for dolls with white skin over dolls with Black skin. In the experiment, African American children were asked to pick between a doll with white skin and a doll with Black skin when given the following prompts: (i) Which doll do you want to play with? (ii) Which doll looks white? Which looks "Negro?" (iii) Which doll is "good?" Which is "bad?" (iv) Which doll looks most like you?

The children almost uniformly said they wished to play with the white doll and that the white doll was good while the Black doll was bad. When the children were asked which doll looked most like them, many broke down into tears. The results were a harrowing testament to the deleterious effects of racial segregation. Erin Blakemore, *How Dolls Helped Win Brown v. Board of Education*, HISTORY CHANNEL (Sept. 29, 2023) (available at https://www.history.com/news/brown-v-board-of-education-doll-experiment) (last accessed July 29, 2024).

9

1407424.1

1

## **ASU Participates in the Nation-Wide Practice of Illegal Gender Segregation**

2

26.    Defendant ASU has engaged in illegal segregation for many years. Today, ASU

3

4

has zero women as head coaches for men's teams.[2]

5

27.    Conversely, as of the date of this Complaint, eight of the thirteen head coaches

6

for the women's teams at Arizona State University are male.

7

8

28.    There is no reason (other than discriminatory attitudes driven by gender

9

stereotyping) for a university to recruit and hire only men to coach men and actively recruit

10

and support men to coach women's teams but deny women the opportunity to coach men

11

and limit their opportunities to coach women.[3]

12

13

29.    Gender segregation in college athletics is not "separate but equal," but rather a

14

one-way segregation that gives men exclusive, complete access to coaching men and

15

disproportionately larger access to coaching women when compared to the opportunities

16

17

given to female coaches seeking to coach men.[4]

18

19

20

[2] *Equity in Athletics Data Analysis: ASU*, UNITED STATES DEPT. OF ED. (Fiscal Year 2023) (available at https://ope.ed.gov/athletics/#/institution/details (search ASU and select "Coaching Staff and Salaries" tab)) (last accessed July 29, 2024).

21

[3] "Based on our results and other findings (e.g., Berri et al. 2009) that have examined the impact of head coaches on teams' and players' performances, it appears that both men and women are readily equipped for success in the coaching profession (and in some cases, women coaches have been more successful than the male coaches they replace; Aicher and Sagas 2010). As such, our results imply that the absence of women coaches for men's teams is not grounded in any objective or reliable evidence."  Darvin, L., Pegoraro, A., & Berri, D*., Are Men Better Leaders? An Investigation of Head Coaches' Gender and Individual Players' Performance in Amateur and Professional Women's Basketball*, SEX ROLES, 78:455–66 (2018).

22

23

24

[4] "Imposing sex segregation on sports is problematic for many reasons. Sex segregation reflects and reinforces a binary view of both sex and gender unsupported by science. It communicates that women are physically unable to compete against men, even though research indicates considerable variation among individual athletes and different sports, and further reveals that attributes other than sex are often more important determinants of athletic ability. It reinforces unfounded gender stereotypes that harm both women and men. And sex segregation uncritically prioritizes athletic activities involving strengths typically associated with male bodies, without requiring us to ask why we view these strengths as the most important in the first place." Leong, *Against Women's Sports*, 95 WASH. U. L. REV. 1 (2018).

25

26

27

28

1407424.1

30.     Defendant ASU's participation in *de facto* segregation against women constitutes a separate claim under 42 U.S.C § 2000e-2(a)(2) and supports a claim for a hostile work environment, regardless of whether the female coach ever applied for a position to coach men.

31.     The fact that Defendant ASU permits, enables, or enforces *de facto* segregation is also proof of a hostile work environment and wrongful termination in violation of 42 U.S.C. § 2000e-2(a)(1) based on gender stereotyping.

32.     Plaintiff Sanja Tomasevic alleges that Defendant ASU engaged in discrimination via stereotyping. The discrimination occurred via the direct application of stereotyped evaluations of Plaintiff Sanja Tomasevic as a female coach.  The discrimination also occurred via Defendant's reliance upon, or the influence of, stereotyped evaluations by athletes and third parties.

33.     Whether the termination of Plaintiff occurred due to gender stereotypes about female coaches or female athletes held by the administration, or due to the administration being influenced by the stereotyped evaluations of third parties or student-athletes, the decision to terminate Coach Tomasevic was because of sex/gender and violates federal law.

34.     The effects of segregation in athletics support a claim of gender discrimination in two primary ways. First, continued illegal segregation supports the **perpetuation of gender stereotypes** in the minds of every person who lives or works in the college sports system. Just as racial segregation against Black Americans (*de jure* prior to 1959 and *de facto* post 1959)

11

could not remain in place without millions of people holding racial stereotypes, the same is true about gender segregation in athletics today.

35.     The only way that segregation continues is if not one or one hundred, but almost every athlete, parent, and administrator accept that women are segregated from coaching men and limited in coaching other women.  To accept that status quo one must believe in or tacitly accept the gender stereotypes that justify segregation, in the same way we did with Black people.

36.     The reality of continued segregation and the resulting stereotypes provides evidence that **gender motivates athletes' complaints about female coaches and the administration's response to those complaints.**

37.     Second, the effects of segregation create **added work for a female coach** as she must walk the lines required to maintain her coaching position and manage the double standards placed upon her by the pressure of gender stereotypes.

38.     This supports a claim of a hostile work environment for any coach (regardless of whether she applied to coach men) as **her working conditions are irrevocably altered by her status as a member of the segregated group**.

39.     As demonstrated in the factual summary below, Coach Tomasevic was working daily not only to do her job, but also to manage the socialized and stereotype-driven expectations of her athletes while being undermined by ASU administration.  This added work and pressure was directly related to her gender and altered the conditions of her employment.

This is especially clear when the expectations placed upon Coach Tomasevic are compared to the expectations the University placed on a male coach doing the same job.

### Added Stereotype Risks Resulting from Gender Socialization

40.    Gendered socialization covers many aspects of how we raise children and learn from our environment, but in this context, it refers to the differences in how young men and young women report their emotional responses to perceived risks of emotional or physical harm.

41.    Men and women feel emotion (fear, worry, insecurity, threat) in similar ways, but they are often socialized to express that emotion differently. Young women are socialized to report emotion and risk more openly to each other, to parents, and to other third parties, while young men are socialized to refrain from reporting their emotions or potential risks.

42.    Adults (parents who raise children and members of university administration in the context of sport) are the group who participated in the socialization of young men and women to respond to and report these risks in different ways. As such, non-student-athlete adults will hold a stereotyped expectation that young females report or respond in a specific way to emotional and physical risk and will also hold a stereotyped expectation that males report or respond differently to exposure to similar emotional and physical risk.

43.    Gender socialization results in a process where young men and women report their concerns differently because they are expected to do so and will, separately, result in a differential response by older adults to those concerns. This often results in non-student adults (parents and administration) feeling less engaged or interested in responding to, or "fixing"

13

the worry, fear, or concern if it is expressed by a young male and being far more engaged and wanting to "fix" the worry, fear, or concern if it is expressed by a young female. The common response is to put one's arm around a female student-athlete to reassure her, while telling the male to "buck up." This response is part of our socialization of young men and women, and it is a process that continues through young adulthood and certainly through the college years.

44.    Gender socialization is a process that has a particular impact on men and women participating in athletics and today, is a force (separate from the stereotypes about women in coaching) that adds to the burdens on coaches of women's teams compared to men's teams and that places even higher expectations on female coaches of women's teams.

45.    Gender socialization will result in more concerns of emotional or physical risk being raised to administration by female athletes compared to male athletes. That creates a false data set or misperception that a coach of a female team (regardless of coach's gender) is getting more complaints than a coach of a men's team. Gender socialization also creates pressure to respond differently to concerns raised by male or female athletes. Administration will respond differently by trying to manage, seeking to fix, or trying to protect the female athlete's feelings while limiting or responding negatively to concerns raised by males for the same type of behavior.

46.    Athletics requires a process that places some level of mental and physical stress on the athlete. This includes the physical stress required to break through barriers that prevent someone from running/swimming faster, jumping higher, lasting longer, or otherwise competing within the physical requirements of the sport when compared to other athletes on

1407424.1

the team or competitors. It includes the mental stress required to break through the mental blocks that prevent any human being from doing the work to run faster, jump higher, or last longer while playing a sport. Mental barriers can be as simple as getting out of bed to go work out or practice, to withstanding pain/discomfort while breaking through physical barriers to high performance, or as complex as not giving up at a key moment, staying motivated, or overcoming imposter syndrome when one is about to achieve one's highest goals.

47.    As a result of these gendered socialization differences, coaches of female programs receive more student-athlete complaints when compared to coaches of male programs, regardless of whether the coaches are behaving any differently toward the athletes than coaches of male programs.

48.    Defendant is fully aware that female teams make more complaints about their coaches than male teams, despite the coaches utilizing the same or similar coaching methodologies.

49.    When a report is made about the behavior of a female coach, a university is more likely to fault the female coach than it would be to fault a male coach for engaging in the same behavior.

50.    Because of gender stereotypes and gendered socialization, a university will fault the female coach in several ways:

- The university will fault the female coach for the mere fact that the athletes claim to be harmed or feel negative emotions.
- The university will more quickly, and with less evidence, fault the female coach for any mistake, act of poor judgment, or out-of-context comment.

15

- The university will place pressure on the coach to "fix" the problem by changing her communication style or coaching methods.

51.     Complaints about Coach Tomasevic were, at least in part, because of gendered socialization and the differential gendered expectations placed on her as a female coach.

52.     Gender socialization is a fact of life. It is scientifically supported and its impact on our collective evaluations of the role of men and women is unquestionable.  Yet, not a single university, including ASU, takes gender differences into account to ensure that male and female coaches are judged fairly, paid equally, and are not held to different standards.

53.     Gender socialization is a form of gender stereotyping.  Gender stereotypes cause young men and women to feel they are expected to report or not report risk and gender stereotypes in administration create differential responses to those reports by males or females, which, in turn, entrenches the socialized expectation that male and female athletes report these risks in different ways.

54.     Gender stereotypes (about women in leadership/coaching and responding to young male and female concerns of risk) are so prevalent that it likely will impact almost every person reading this Complaint.   To offset the negative effects of stereotypes requires placing the role of gender in the context of other forms of discrimination, such as race.

55.     The process of gender socialization would be no different than in the latter days of racial segregation if white and Black students tended to report their coach or professor for different reasons based on how each group was expected to respond based on their race and, separately, how they chose to complain depending on the race of their coach or professor.   It is no different than if members of a university administration (as would have been the case at

16

that time) took the complaints of white students seriously and tried to manage, fix, or protect white students who complained while discouraging or ignoring Black students. In either situation, the complaint process (why students report or fail to report) and the administration's reactions to those complaints (why or how the administration responds to the concerns) is based in whole or in part on the race of the student-athlete.  Any decisions based on race (of the athlete or the coach) would be illegal.

56.    Like today with gender segregation in athletics, the student complaint process and administration response to the complaint process in the example above will ignore whether the complaints of athletes are justified (show a violation of law or university policy). It will also ignore whether white and Black coaches or coaches of white and Black teams are coaching in the same, acceptable manner. The process is driven by race and so it will always focus on the expectations of how each race should complain and the response to those complaints based on racial stereotypes about the athletes and the coaches.

57.    The complaint process will place added pressure on those who coach whites (in this example) while removing pressure from those who coach Black players.  The race of the coach also matters, as whites will tend to report Black coaches more often than white coaches, consistent with stereotyped expectations, which, as mentioned above, require a Black coach to work much harder to "keep the peace."  Finally, this process will result in valid concerns of Black student-athletes being ignored.

58.    Today, while racial bias continues to have effects, the undeniable factor in college athletics that creates a differential response between athletes and coaches is gender.

It results in more complaints from a women's team compared to a men's team. It results in more complaints directed toward female coaches than their male counterparts. It results in universities enabling the unsubstantiated complaints of female athletes, which are more often directed at female coaches more than male ones. It results in a process that overlooks or ignores the harm inherent in creating a system that has resulted in men coaching the vast majority of men and the majority of women, while female coaches are left to pick up the scraps. It is a process that is driven by gender stereotypes. For these reasons, we as a society cannot allow these prejudices to inform any part of the decision-making processes regarding employment in athletics. Not only does the current hiring system constitute outright segregation, it also makes more work for female coaches who are fortunate enough to escape the hiring process with a coaching position, often leading to their terminations or resignations.

### Knowledge of Stereotype Risk and Breach of Duty of Care

59.    The University's obligations under Title VII creates a duty to take reasonable care to prevent harm from gender stereotypes.

60.    Title VII requires an employer to protect employees from gender-based discrimination in the terms and conditions of their employment. This includes a duty of care to avoid forms of discrimination that represent a known risk to employees.

61.    While there is an obligation to avoid discrimination toward all protected classes, the risk of gender stereotypes is so well known and so acute in the case of college athletics that a duty of care exists to prevent harm from this known risk.

1407424.1

62.     ASU is aware of its obligations under Title VII.  All universities, including ASU, provide training on biases and stereotypes.

63.     ASU has a duty to exercise reasonable care to prevent reliance on stereotypes that negatively impact women in athletics.  This duty is the result of: (i) the direct obligation to prevent all forms of discrimination under Title VII; and (ii) the general knowledge of the risks of gender stereotyping, as well as the training provided by the University that creates awareness of these risks.

64.     ASU's participation in the segregation of females from coaching males is evidence of actual knowledge of the risk of stereotypes impacting women and is also *constructive knowledge of this risk as a matter of law*.

65.     In this case, ASU knew several athletes were making unfounded complaints. ASU also knew or should have known that Coach Tomasevic had done nothing to justify the complaints about her behavior or performance. She had, in fact, increased the team's and athletes' performance relative to prior years.

66.     Given the University's knowledge of the risks inherent in a gendered, segregated system and the attendant legal duty to avoid those risks, ASU had an obligation to exercise due care in its response to the complaints about Coach Tomasevic raised by the athletes.

67.     Defendant ASU failed to exercise reasonable care in collecting the complaints.

68.     The University permitted athletes to complain outside of the formal student grievance process.  Even athletes who allege they have been sexually assaulted by a fellow

19

1407424.1

student are required to follow a protocol to report their claims about a fellow student or employee.

69.    The Defendant knows that a formal process is necessary to reduce or remove the effects of all forms of bias or stereotyping.  Defendant has such processes in place, but in response to female athletes alleging emotional upset or expressing petty criticisms about a female coach, ASU ignored its process and permitted the stereotypes about the coach to run free.

70.    Within the University's formal grievance process (had it followed its internal protocols to collect and evaluate complaints and provided Coach Tomasevic a chance to respond and defend herself), ASU failed to exercise its duty of care to avoid the harmful effects of gender stereotypes in its response to athletes or evaluation of coaches in additional ways.

71.    ASU failed to require that athletes and other potential complainants be notified of or trained on the risks of gender stereotyping. ASU's process has no accountability measures to reduce the impact of stereotypes and implicit biases.  The process does not require that athletes put their concerns in writing or limit their complaints to information based on personal knowledge. They are permitted to verbally report and/or submit complaints informally via email without then being required to formalize their concerns in writing in a manner to ensure accountability. Memorializing complaints in writing is of paramount importance, as documentation creates an accountable grievance process that makes a parent, or athlete feel responsible for putting specific information or concerns based on their personal

knowledge in writing, with the knowledge that the object of the complaint will then be provided an opportunity to respond, in this case the head coach. ASU's grievance process does permit complaints to be transmitted to the head coach or permit her an opportunity to respond, provide context, or defend herself.

**Risks of Gender Stereotypes Affecting Female Coaches**

72.    Female coaches are expected to behave in a manner that is consistent with societal stereotypes about females.

73.    Societal expectations of females include that they identify with the role of family caretaker/nurturer, not the role of a "leader," such as a head coach.

74.    The role of leader, or head coach, was designed and remains defined as a "male-type" task. Coaching behavior is, therefore, supposed to be consistent with expectations of how a male should behave, not a female. The fact that head coaching positions remain associated with male-type tasks or behavior results from gender stereotyping.

75.    These expectations or stereotypes about the roles of females in society create what is called a "lack of fit" or "role incongruity," wherein women holding high-level positions such as administrator or head coach are considered inappropriate for those positions if they fail to exhibit traditionally "masculine" leadership qualities.

76.    This lack of fit leads students, parents, and administrators to evaluate the behavior of female coaches differently than they evaluate the behavior of male coaches. This differential evaluation occurs regardless of whether the team is comprised of male or female athletes.

77.     As a result of stereotypes, a female coach who behaves in a stereotypically feminine manner is faulted for being "too soft" or "effeminate" in their coaching style. A female coach who behaves in the way we expect head coaches to behave (i.e., male-type tasks and behavior) is often faulted for being "too harsh" or "aggressive."

78.     Males are not similarly evaluated based on this double standard.

79.     The double standards, "lack of fit" analysis, and stereotyping often result in a litany of student-athlete complaints being levied against female coaches.

80.     These student-athlete complaints occur even though the female coaches are not coaching any differently, and certainly no more harshly, than similarly situated male coaches. The stereotyped beliefs held by most athletes, parents, and administrators will regularly cause an athlete or parent to misjudge a female's normal coaching methods or behavior as somehow inappropriate or incongruent with the putative complainant's expectations.

81.     Often, a female coach's methods or behavior are misjudged as: (i) intentionally harmful to the athlete when they are neither intentional nor harmful; and/or (ii) not reflecting concern for the athletes' well-being, even when the coach is acting in the team's best interest. These are just a few of the ways that female coaches are often misjudged or negatively evaluated by athletes, parents, and university administration.

82.     A female coach's actions are misinterpreted due to stereotyping, and she is blamed for the feelings of the athletes. Societal and systemic stereotypes cause us to expect female coaches to manage and control the feelings of their athletes: to ensure they are happy, have no hurt feelings, and do not fear emotional or physical harm.  This socialized role of

how a woman is supposed to behave when dealing with the emotional or physical fears of young adults is inconsistent with the profession of college coaching, a profession that requires coaches to stress athletes to help them achieve their highest physical and mental performance, not only for the benefit of the team, but also for the benefit and betterment of the individual athlete.

83.    Athletes expect collegiate and professional coaches to be firm, direct, and even authoritarian at times. However, those characteristics are more consistent with the common expectations of how men are supposed to behave, not women.  When a female coach seeks to exhibit behavior that fits with the expected role of a head coach (firm, direct, authoritarian), she will often receive backlash in the form of complaints or negative evaluations.

84.    Coach Tomasevic was using coaching methods that were no different or more extreme than any other collegiate or professional coach would use. She was not doing anything that any male coach would not do.  She was engaging in no language or actions that any university or professional coaching organization would view as abusive, harmful, or outside the bounds of professional behavior.

85.    There were male coaches at ASU who, especially when compared to Coach Tomasevic, were engaging in coaching that was harmful, disrespectful, and, if not crossing the line, straddling the line between professional and unprofessional coaching methods.

86.    Coach Tomasevic was negatively impacted by gender stereotypes in the assessment of her behavior, her coaching methods, and her performance. Despite engaging in

1407424.1

the same behavior or, more often, less harsh or potentially offensive behavior compared to her male counterparts, she received complaints from athletes.

87.     These double standards result in student-athlete complaints about coaches. Both the double-standards and the complaints are the direct result of gender bias. Universities making employment decisions that rely in whole or in part upon student complaints about their coaches which are premised upon bias or stereotypes are liable for gender discrimination under Title VII.

88.     Universities also react and respond differently to complaints from female student-athletes when compared to males. For example, university administration will often coddle and appease female student-athletes who complain about their female coach yet ignore or overlook similar complaints from male student-athletes about their male coach.

89.     As a result of this double standard, male athletes who complain about their coaches are at a higher risk, as their complaints are often ignored. Likewise, it places female coaches at risk, as they may receive more student complaints and are held to a higher standard by the administration.

90.     Actions taken by university administration on the basis of this double standard – relying on biased complaints made by student-athletes, treating the complaints of female student-athletes differently than male student-athletes, or holding the female coach to higher standards than male coaches – are all forms of gender discrimination that violate Title VII.

91.     A female is expected to behave in a manner that is consistent with societal stereotypes about females. If she behaves in a stereotypically feminine manner, then she is

24

faulted for being "too soft" as a coach. If she adopts a more traditional, "masculine" coaching style, then she is faulted for being "too harsh." This double standard results in backlash from students and parents that often takes the form of student-athlete complaints. These complaints are, in whole or in part, a response to the failure of the female coach to behave in a manner that fits the stereotyped expectations of athletes or parents. A university that relies, in whole or in part, upon complaints generated by bias or stereotypes engages in gender discrimination.

92.     Relying on biases and stereotypes to make an employment decision—for example, relying on biased student-athlete complaints against coaches, treating the complaints of female athletes differently than those made by male athletes, or holding female coaches to double standards—are forms of gender discrimination that violate federal and state anti-discrimination laws.

## JURISDICTION AND VENUE

93.     Jurisdiction and venue exist in this Court, as the events giving rise to this lawsuit occurred in Tempe, Arizona.

94.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and the Court's pendent claim jurisdiction under 28 U.S.C. § 1367(a).

95.     Venue is appropriate in this District under 28 U.S.C. §§ 1391(b) and (c).

96.     Sanja Tomasevic's EEOC charge against Defendant was filed on May 16, 2023.

97.     The EEOC charge alleged, *inter alia*, that Defendant discriminated against Sanja Tomasevic on the basis of sex and terminated her in retaliation for protected complaints.

1407424.1

98.     The DOJ issued a Notice of Right to Sue dated February 13, 2025. This action is being brought within ninety (90) days of the issuance of the Notice of Right to Sue.

## PARTIES

99.     Plaintiff Sanja Tomasevic, a female, is a resident of Phoenix, Arizona.

100.    Defendant Arizona State University is an institution of higher education located in Tempe, Arizona whose athletic teams participate in the NCAA Division I Atlantic Coast Conference.

101.    Defendant Board of Regents ("Board") is a Corporation under the provision so the Arizona Education Act, A.R.S. 15-1625 and can "[sue] and be sued" in the corporate name. The Board is a State agency that is organized and existing under the laws of the State of Arizona.

102.    Defendant ASU is a State university maintained and overseen by the Board of Regents pursuant to the Arizona Education Act. (A.R.S 15-1601 et seq.).

## STATEMENT OF FACTS

### Background

103.    Plaintiff Sanja Tomasevic is an objectively high-achieving volleyball player.

104.    She has played volleyball for about 23 years.

105.    Plaintiff attended the University of Washington, leading them to four NCAA appearances and two Pac-12 Conference Titles.

1407424.1

106.    She became the second individual volleyball player to be inducted into the Husky Hall of Fame.

107.    Plaintiff ended her career as Washington's all-time leader in points, kills, and service aces.

108.    Plaintiff continued a professional volleyball career after graduation.

109.    She was a member of the Serbian National Team where she won championships in Serbia, United States, Switzerland, Greece and finished 2nd in the European Challenge Cup.

110.    In 2005, Sanja was named the best player in the USA and best server in the Challenger Cup in 2010.

111.    After a very successful volleyball career, Plaintiff decided to take her multiple volleyball talents into coaching.

112.    Plaintiff began her coaching career as an assistant volleyball coach at the University of Texas - San Antonio from June 2012 through February 2014.

113.    She then served as an assistant volleyball coach at the University of Miami from February 2014 through March 2016.

114.    She was instrumental in leading her University of Miami team to back-to-back NCAA Tournament appearances.

115.    The 2015 season was the University of Miami's second straight season with 20-plus wins.

1407424.1

**Facts**

116.    In March 2016, Plaintiff was hired as the Assistant/Recruiting Coordinator at Arizona State University under Head Coach Stevie Mussie.

117.    Following the conclusion of the season, Head Coach Mussie was terminated.

118.    Plaintiff was then made aware that Senior Associate Athletics Director Ken Landphere, as well as many volleyball players, believed that Plaintiff should get the head coaching position.

119.    On November 27, 2016, Plaintiff was promoted to Interim Head Coach and later applied for the Head Coaching position.

120.    Plaintiff was interviewed by three administrative staff members and AD Anderson.

121.    During the interview, Mr. Anderson specifically questioned Plaintiff on why he should hire her, *when hiring a young female coach without experience* placed them in the position they were in.

122.    Mr. Anderson was referring to the hiring and termination of the previously female coach, Coach Mussie.

123.    After the interview, Mr. Anderson informed Plaintiff that he was going to interview other candidates and would let her know their decision.

1407424.1

124.    On December 22, 2016, Plaintiff contacted Senior Associate AD Landphere and inquired as to when a decision would be made about the position. Mr. Landphere informed Plaintiff that she had been hired.

125.    When Plaintiff took over as head coach, Mr. Landphere told her not to expect much from the program for the next 4-5 years because "[they were] building it from 6 feet under."

126.    **The comment was consistent with other comments from the Athletic Director that ASU understood that the program would require rebuilding and was not really funded to compete in the conference.  Such comments were in addition to the overall approach to the Women's Volleyball team as an afterthought in terms of expecting competitive success.  Any reliance on Plaintiff's win-loss record as a justification for her later termination was inconsistent with these comments and treatment of her program and was a pretext for her termination.**

127.    Male programs were not treated in this manner and were expected to compete (because the athletes or coach was male) and/or given more resources to compete.

128.    At the time Plaintiff was hired, the volleyball program was working on competing in a competitive Pac-12 conference, but they did not receive the necessary travel and recruiting expenses to do so.

129.    Despite their financial deficiencies, Plaintiff did not fail to work to ensure her team could compete and was able to get ASU volleyball ranked in the top 25 in part of their 2018 and 2019 seasons.

1407424.1

130.    They also defeated teams with better rosters than ASU, such as Washington, Oregon, South Carolina, and Colorado.

131.    At the end of the 2019 season, the team was one game short of making it to the NCAA tournament.

132.    Despite these successes with limited resources and bias-driven low expectations of administration, the program was held back or risked taking further steps back in recruiting and competition because of the poor facilities compared to other competitive programs at other universities.

133.    In mid-2019, ASU had plans to build a multi-sport facility that would house hockey, wrestling, gymnastics, and volleyball.

134.    There was media coverage about the new facility and ASU students and staff alike expressed excitement.

135.    Coach Tomasevic used this as a recruiting tool, as incoming athletes are attracted to new facilities.

136.    As a selling point for the volleyball program, many of the incoming freshmen knew of the new facility and were excited about it.

137.    Towards the end of 2019, Coach Tomasevic was in a department meeting, which included discussions about the new facility.

138.    It was mentioned that hockey, wrestling, and gymnastics would be in the facility.

139.    After the meeting, Plaintiff questioned where volleyball fit into the facility.

30

140.    She was told that ASU no longer had plans to include volleyball in the new facility.

141.    Coach Tomasevic was shocked and confused as to why this was the first time that she was hearing this information as it risked her losing credibility with her team.

142.    Having used this as a recruiting tool, she was worried about the reaction of her current and future players.

143.    In the spring of 2020, Plaintiff received a donation of $20,000 from a donor who wanted to remodel the volleyball offices.

144.    Plaintiff asked the donor if she could use that money to provide her volleyball team with a life coach instead.

145.    The donor agreed, as they thought it was an excellent idea that Coach Tomasevic wanted to invest more into her players, than in offices.

146.    The donor agreed to pay for the life coach as long as Plaintiff was with the team.

147.    Plaintiff discussed her decision with the ASU Women's Basketball Coach Charlie Turner Thorne.

148.    Coach Turner Thorne suggested Life Coach Carlette Patterson who helped improve the team culture of the women's basketball team.

149.    Coach Tomasevic decided to hire Ms. Paterson based on the recommendation and the idea that she would be able to help the girls not only in volleyball, but also in life.

150.    Shortly after Ms. Paterson was hired, the Covid-19 pandemic required the sessions to be on Zoom.

31

1407424.1

151.    Plaintiff credits Ms. Paterson for helping the players work through the pandemic and the resulting stresses.

152.    Later that spring, the donor's donation towards Ms. Patterson's services was taken from the volleyball program.

153.    Plaintiff was notified that she could not have a life coach due to financial limitations.

154.    In another conversation with the original donor, Plaintiff explained that they were no longer working with the life coach due to financial issues.

155.    The donor felt strongly about the life coach and again, personally donated $8,000 for Coach Tomasevic to continue to utilize Ms. Paterson's services with the players.

156.    In the fall of 2020, Plaintiff and her team began training.

157.    Due to the Covid-19 pandemic, the start of their season was delayed a month, and was ultimately cancelled.

158.    This cancellation was devastating to Coach Tomasevic and her team.

159.    The team was led by two seniors, one who was ranked in the top three players in the Pac-12.

160.    One of the seniors decided to forgo her extra year of eligibility because it would interfere with her plans to attend nursing school.

161.    The second senior, who was ranked one of the top three players in the conference, decided that she wanted to go professional instead of attending graduate school.

1407424.1

162.    In both instances, while Plaintiff was disappointed, she understood her players' desires and motivations.

163.    The upcoming season was challenging, not only due to the Covid-19 pandemic but also because of the age and inexperience of the young team.

164.    During this time, Coach Tomasevic had to meet with Noa Miller, a player who was having difficulty getting along with the other players on the team.

165.    This created a problem with the team's chemistry and culture.

166.    Plaintiff explained to Ms. Miller that she should focus on getting along with her teammates.

167.    Thereafter, Ms. Miller left the team without notifying Coach Tomasevic. Senior Associate AD Landphere was the one to tell Plaintiff of Ms. Miller leaving the team.

168.    Ms. Miller complained to the compliance office and administration about Coach Tomasevic.

169.    Shortly thereafter, an investigation was conducted into Plaintiff's behavior. This athlete had also filed a complaint with the NCCA and the president as well.

170.    The investigation concluded and there were no findings of any wrongdoing.

171.    Unhappy with the results, Ms. Miller went to Human Resources and initiated a new investigation into Coach Tomasevic.

172.    This investigation was conducted without Coach Tomasevic's knowledge.

173.    Plaintiff continued to recruit and coach without awareness of the ongoing investigation.

1407424.1

174.    Members of her staff knew that she was being investigated because they had been asked to participate.

175.    During this time, in spring of 2021 Mr. Lanphere was replaced by Senior Associate Athletic Directors Christina Wombacher and Graham Rossini.

176.    Eventually, Plaintiff found out about the investigation and asked the Senior Associate ADs how she should proceed.

177.    Ms. Wombacher and Mr. Rossini told her to continue to do her job as normal.

178.    The investigation lasted approximately three months.

179.    In late June or early July of 2021, Coach Tomasevic was called into a meeting with Mr. Landphere, Ms. Wombacher, and Mr. Rossini.

180.    During this meeting, Plaintiff was informed that nothing had been substantiated in the second investigation.

181.    When Plaintiff asked about the specific complaints and findings, administration told her something to the effect of, "Parents and kids are what they are nowadays," and "Parents are even softer than the athletes."

182.    During this meeting, Plaintiff was also given a document with pointers on how to communicate as a coach.

183.    This document had several bullet point "pointers" instructing Coach Tomasevic to be mindful of her body language, to smile at athletes, and to use a "clear and vigorous" voice on some occasions, while also remembering to soften her voice on others.

1407424.1

184.    The document also reminded Coach Tomasevic to, "Pay attention (make sure to establish and maintain good eye contact), listen to the content and observe emotion, demonstrate that you understand what is being said, and conclude the conversation by summarizing what you heard."

185.    Each of these criticisms was the direct result of gender stereotypes, either stereotypes about the expected behavior of a female coach or the patronizing response to the claimed emotional response of female athletes.

186.    No male coaches received these types of instructions.

187.    During this meeting, Coach Tomasevic was told that she was "intimidating" because she was a tall woman with a strong presence and a Russian accent.[5]

188.    Plaintiff was told that she needed to "be aware of that."

189.    She was also told that she looks angry when she crosses her arms while coaching.[6]

190.    These criticisms reflected her engaging in male-type or masculine coaching traits that then resulted in a negative response from some athletes—a response that would not occur if she were male or if her athletes were male.

191.    Following this meeting, Plaintiff spoke with Ms. Paterson and the school's Sports Psychologist to support her in ensuring she carries out these instructions.

---

[5] Plaintiff is not Russian.
[6] When the season started back up again, Plaintiff made it a point to hold her iPad throughout games, even when she didn't need to, to prevent herself from crossing her arms.

192.    Soon thereafter, Coach Tomasevic was told that she was no longer allowed to tell the players or even suggest when they should be back on campus before their season started.

193.    Typically, Plaintiff would have them come back in June to start preparing for the upcoming season.

194.    Plaintiff knows of no male coach who was told he could not require or suggest to his players when they should come back to begin preparing for the season ahead.

195.    Each of the actions of Defendant enabled the stereotype-driven expectations being placed on Plaintiff.  By requiring that she change her behavior to reduce her use of masculine traits, it fed the athletes' perceptions that there was something wrong with a female engaging in such methods. It also undermined Plaintiff's credibility with the team and risked further complaints.

196.    At the outset, the fall 2021 season was promising, but Plaintiff faced challenges.

197.    The incoming 2021 class brought in five freshmen, with one ranked among the top 34 recruits in the country.

198.    This player was supposed to be ASU's starting setter and run the offense.

199.    This player began to focus on health and fitness instead of her dedication to volleyball.

200.    However, this player experienced the death of her father, which resulted in understandable taxing personal issues.

1407424.1

201.    Another freshman was required to have surgery at the end of her high school season. This player was unable to begin playing until October.

202.    Coach Tomasevic's team had some success during this season, including beating teams that were considered to be better than them, like UCLA, Utah, and Colorado.

203.    Ultimately, the losses that year were the result of the players' inexperience.

204.    Plaintiff had a player on the team who could be difficult to work with.

205.    This player did not get along well with the other athletes, would not listen to the assistant coach when it came to certain exercises, and would consistently miss treatments.

206.    Eventually this player was afforded a psychologist who began working with her.

207.    Unfortunately, the psychologist stopped offering her services with this athlete-patient because she was not putting in the work to improve her well-being.

208.    This athlete was also failing to complete her academic work.

209.    Plaintiff informed Senior Associate AD Wombacher about the challenges she faced while coaching this player.

210.    Ms. Wombacher asked Coach Tomasevic to document why this player was hard to work with.

211.    Plaintiff did so, maintaining documentation from trainers, coaches, and professors.

212.    Towards the end of the fall of 2019, Ms. Wombacher kicked this player off Plaintiff's team without her consent.

37

213.    The player was upset with Coach Tomasevic and tried to blame her, despite the decision being made by Ms. Wombacher.

214.    This player was allowed to keep her scholarship and attend ASU as a student.

215.    This left Coach Tomasevic with 11 full scholarships instead of 12 for the next two seasons.

216.    Each of the examples and events noted in the paragraphs above, including the personal issues of an athlete, the need for a life coach, the effect of COVID, the not getting along with others, the loss of eligibility, etc., are all part of the normal process of being a Division I athlete. All athletes have these issues and concerns, including males. However, only female teams are enabled to blame their coach and, most often, their female coach in this way.

217.    When the administration places more pressure on the female coach to stop her normal coaching or address every athlete's concern, or undermine the coach's authority, this feeds the athlete's biases about their coach and increases the feelings of toxicity both in those athletes who remain and those who were transferring.

218.    During the 2021 season, Plaintiff was still under pressure to act certain ways in accordance with the Senior AD's advice and preferences.

219.    For example, Ms. Wombacher advised Plaintiff that she should clap more and be more encouraging to her players.

220.    Once again Plaintiff was being managed to behave more like what is expected of a female than as a head coach.

38

221.    Following the 2021 season, Coach Tomasevic's players were motivated to improve.

222.    After having a watch party for the NCAA selection, the players decided they wanted to be top 16 the next year.

223.    Coach Tomasevic promised her players that she would do her best to train them and get them as prepared as she could.

224.    Plaintiff believed that her team could reach the top 16, but she knew they would need to put in a lot of work to reach their goal.

225.    In the spring of 2022, the players made significant improvements.

226.    Their numbers on the court and in the weight room reflected this improvement.

227.    To stay competitive, the players scrimmaged against each other.

228.    Scores and individual player statistics were recorded during these scrimmages.

229.    In one of the life coach meetings, some of the players expressed that they wanted to have these numbers hidden and only given to each individual player if they asked for them. The players stated that having the numbers broadcasted made them feel bad.

230.    Coach Tomasevic believed that it was important for each player to know how they compared and how they could improve.

231.    The players disagreed. They expressed frustration with having to compare themselves to others on social media daily, and they did not want to have to do that at volleyball practice.

232.    This emotional barrier by the athletes was getting in the way of Plaintiff's coaching, and she tried to explain the benefit to the athletes. However, it was a non-negotiable for the athletes, and eventually the scores were hidden per their request.

233.    The team's last season practice was on April 28, 2022.

234.    Coach Tomasevic was not allowed to encourage the athletes to come back to campus early to practice before the season started.

235.    Because of that, Plaintiff did not see the athletes again until August 8, 2022. Official practice began on August 9, 2022.

236.    It appeared to Coach Tomasevic that many of the girls had not played much volleyball during the summer.

237.    The athletes were out of shape and unprepared for their first game on August 27, 2022.

238.    Acting in accordance with her duties as a head coach, and especially because the players expressed their goal to be top in the 16 that year, Plaintiff created a challenging schedule.

239.    Unfortunately, the team began losing in their preseason tournaments, and the atmosphere of the team shifted.

240.    The players were split on which setter they wanted to play with.

241.    Coach Tomasevic made the ultimate decision to play the setter who was more in shape and athletic on the court.

242.    Plaintiff used numbers from the previous seasons to support her decision.

40

243. Before the end of the season, Plaintiff had a meeting with the administrators.

244. During this meeting, administration complimented Plaintiff and conveyed that they had seen a lot of improvement in her body language and communication style.

245. Coach Tomasevic invited them to practice so they could continue to see this improvement, but they never took her up on it.

246. **The entire process that investigated and then required Plaintiff to "change" her coaching style simply enabled the stereotypes. It was both negligent and driven by stereotypes to require that she accommodate the biases of athletes by making such changes to her style.**

247. During the last month of the season, Mr. Rossini suggested that he and Plaintiff sit down and go through the roster and discuss which players to keep and which should leave the team.

248. Plaintiff was excited because she knew the team needed a change.

249. Since the transfer portal was so new, Coach Tomasevic had not been able to benefit from it since she had such young players.

250. Coaches, especially those of male sports, are encouraged to use the transfer portal as a tool.

251. No one indicated to Coach Tomasevic that having players enter the transfer portal would be seen as a negative.

252. Seven players entered the transfer portal that year.

253.    Plaintiff felt like those players who entered the transfer portal could be replaced, and she was excited about the new potential.

254.    During their end-of-the year meeting, the players who entered the transfer portal stated that their reason for leaving was due to a "toxic/hostile culture" and mental health.

255.    Coach Tomasevic listened to their feedback and offered to assist them in transferring on to their next school.

256.    Plaintiff kept notes of those meetings and made sure the administration knew how each meeting went.

257.    Mr. Rossini and Plaintiff met bi-weekly and discussed the player meetings.

258.    On December 6, 2022, Mr. Rossini expressed his excitement that they were able to keep all of their best players and use the transfer portal to replace the ones that left.

259.    On December 8, 2022, Plaintiff was invited to a meeting with Mr. Anderson.

260.    On December 9, 2022, Plaintiff attended the meeting with Mr. Anderson, Ms. Wombacher, and Mr. Rossani. During this meeting, Plaintiff was informed that she was being terminated.

261.    Administration stated the reason for Plaintiff's termination was that they expected more from her last six years and they didn't like the word "toxic" being used by the players entering the transfer portal.

262.    Defendant terminated Plaintiff because of the continued complaints of athletes that had blamed her for a variety of her methods or behaviors including claims that she or the program was "toxic."

263.    Defendant blamed Plaintiff for these complaints and labels despite knowing they were not founded in any objective fact or rational criticism of her coaching methods and despite knowing that they were likely the result of double standards placed upon her as a female or as a result of her coaching a female team.

264.    Any suggestion (at the time of termination or presently) that Defendant was (in addition to the complaints) firing Plaintiff because they expected more from her in terms of on-court performance, win-loss record, conference play, or competitive success was false or pretextual. Such a claim is entirely inconsistent with a) comments from administration that such expectations did not exist, and b) that the primary concern of the Director was academic success and keeping the athletes "happy."

265.    Such a claim (that on-court or competitive performance was an additional reason for Plaintiff's termination) would not be a legitimate reason or a reason other than gender given that a) males with worse on-court performance were retained and supported by Defendant, and b) the failure to achieve higher on-court performance was due in large part to imbalances or denial of financial and structural resources controlled entirely by Defendant.

**Evidence that "Expected Progress" is Pretexual or Further Evidence of Gender**

266.    During the six years that Coach Tomasevic coached at ASU, she was never told that her performance was unsatisfactory or that her win-loss record or progress toward competitive success was a concern or a factor in the evaluation of her performance.

1407424.1

267.    At the start of Plaintiff's tenure, she was specifically told that they expected little progress for 4-5 years given the hole the program was in.

268.    During the time from the start of her tenure to the end of that five years, Plaintiff observed that her program was treated as an afterthought.

269.    During her fifth year of employment, Plaintiff asked to meet with the athletic director more regularly to gain more respect for her program.  During one of these meetings, Plaintiff asked the Director for the "definition of success and a definition of a successful volleyball program."

270.    The Director thought about the question and responded with, "A successful volleyball program is one that graduates players and where players are happy."  He did not suggest that winning championships was important.

271.    Coach Tomasevic met the graduation expectation of the AD as she made strong improvements in academic success, with her team increasing its GPA each year. She took over a 2.7 GPA and, during her final year, had improved to 3.7.

272.    The lack of expectation of a women's team to increase competitive success or try and get to championship level reflects commonly held stereotypes in the segregated system of college athletics.  A female team is less likely to be valued for competitive success compared to males because of the devaluation of females in sport.

273.    The expectation that the female coach "keep her players happy" is both direct evidence of gender stereotypes and an **effective impossibility for a female coach of a**

44

**women's program for all the reasons noted in prior sections of this lawsuit** discussing the stereotypes affecting a female coach and gender socialization of female versus male athletes.

274.    As a female Coach the Plaintiff will be at constant risk that her engaging in masculine-trait coaching methods (firm, direct, authoritarian) will be viewed negatively by one or many athletes. In short, doing her job while being female will cause athletes to feel "unhappy" regardless of whether she does every other aspect of her job perfectly.

275.    This is the case even if the female coach was working above and beyond to get respect for the team, for the program, and to get access to more resources that would, in effect, make it easier to keep more athletes "happy."

276.    The access to the added resources (to improve perceptions of respect and good feelings on the team or to respond to mental health) is also, again, entirely within the power of the Defendant, not the coach.

277.    The denial of these added resources affected Plaintiff's ability to make more competitive progress and keep the athletes satisfied/happy.

278.    During Coach Tomasevic's tenure with ASU, she constantly advocated for the athletes but was denied resources, decision-making authority and opportunities to coach to her full potential, such as having the team come back to campus three months before the season started to train.

279.    Plaintiff was not afforded this opportunity, and it resulted in players coming back to campus out of shape and unprepared to start their season.

1407424.1

280.    Male coaches, including the male who replaced Plaintiff, were allowed to have their athletes come back early to train.

281.    Further, Plaintiff was paid less than her male, less-experienced replacement. The male who replaced her as head volleyball coach at ASU had never been a head coach before and had no experience playing volleyball—he was a hockey player.

282.    This male's starting pay as head coach was approximately $190,000. Coach Tomasevic was making approximately $160,000 when she was terminated.

283.    Plaintiff went above and beyond to make her athletes feel supported while also training them.

284.    Plaintiff turned down a donation of $20,000 to remodel the volleyball offices, and instead, requested that money go towards a life coach for her players.

285.    When the money for the life coach was removed by ASU's administration, Plaintiff advocated to keep the life coach as she felt it was benefiting her players.

286.    She spoke with the same donor, who agreed with her that the life coach was invaluable to those players. The donor again donated $8,000 so that Coach Tomasevic could keep the life coach.

287.    Plaintiff provided each player with two mental health days per semester. Athletes could take these two days whenever they felt like they needed a mental health break.

288.    Plaintiff had the players' best interest in mind, not the administration, who actively tried to work against Plaintiff and the help she was trying to provide.

289.    Volleyball was not a priority for ASU administration.

1407424.1

290.    The volleyball program was given inadequate resources compared to other sports.

291.    Plaintiff's volleyball team was not given enough money in their budget to bus to some of their games. This forced Coach Tomasevic to drive her players to games in a van.

292.    A Division I coach forced to drive their players to games in a van is unheard of.

293.    The volleyball team's per diem rates for meals were $7 for breakfast, $8 for lunch, and $15 for dinner.

294.    Conversely, the men's teams were able to go into restaurants and have their food paid for.

295.    Furthermore, each player on the men's team had their own individual hotel room, while the volleyball athletes were forced to share rooms.

296.    In reality, Plaintiff was constantly asking for more for her athletes: she regularly requested more money for food and transportation.

297.    Administration would simply tell her there was no room in the budget and to move things around. Plaintiff would even ask to be put in front of the donors so she could ask them herself, which she had success doing, but was still denied.

298.    These discrepancies (financial, respect, etc.) between the male and female teams were well-known to the female players.

299.    Many of the athletes assumed Plaintiff was responsible for these discrepancies.

300.    This obvious unfairness and pervasiveness of the disparities could be perceived by the female athletes as contributing to the claim of a toxic environment.

301.    Plaintiff adjusted her coaching style when she was perceived as being intimidating, even though she disagreed with that assessment.

302.    Plaintiff invited Ms. Wombacher and Mr. Rossini to observe practices, to which they declined.

303.    Plaintiff supported, advocated, encouraged, and sacrificed for the volleyball program at ASU.

304.    Plaintiff utilized extraordinary measures to support and enhance the program.

305.    Despite all of her efforts for the last six years, she was terminated.

### Male Comparators Treated More Favorably

306.    ASU participates in the nationwide practice of illegal segregation and limitation on the hiring and retention of female coaches.  The effects of illegal segregation created and continue the stereotyped expectations of women acting in the role of head coach.

307.    Segregation creates a system where every male coach at ASU is a comparator to Coach Tomasevic. Male coaches are permitted to coach men and women and are permitted to use the entire range of coaching methods without fear of reprisal, including traditionally "masculine" traits – firm, direct, authoritarian.  Notably, these traits are not focused on feelings, relationships, or being likable.

308.    Segregation creates a system where male coaches of men's teams get fewer complaints for engaging in the same or more aggressive (masculine) coaching methods compared to a female coach.  Male coaches of women's teams also get fewer complaints for

engaging in the same or more aggressive coaching methods compared to female coaches.  Male coaches of both men's and women's teams get more leeway from administration to engage in a range of coaching methods similar to or more aggressive than the methods used by female coaches. Male coaches of both men's and women's teams receive more administrative support when they receive criticism from athletes, parents, or donors.

309.    Every male coach at ASU is a valid comparator to Coach Tomasevic as they are either: (i) coaching similarly to Coach Tomasevic *without getting complaints* or as many complaints and not being fired; (ii) coaching more aggressively than Coach Tomasevic without getting complaints or without being fired; or (iii) coaching in a manner that gets complai0nts from athletes, but where administration supports the coach rather than enabling the complaints.

310.    The male coaches were permitted to keep coaching without interference, even when there was knowledge that they were engaging in clearly unprofessional and potentially harmful coaching methods.  Male coaches (men's basketball and football) were retained despite worse competitive success given their access to facilities and resources compared to Plaintiff.

311.    Herm Edwards (former head football coach) has demonstrated extreme confrontational approaches that would be characterized differently if exhibited by a female coach. His intense sideline demeanor and direct communication methods are praised as "passionate leadership" rather than being labeled as inappropriate or unprofessional.

312.    Kenny Dillingham (current head football coach) has demonstrated approaches that would be characterized differently if exhibited by a female coach. His intense sideline

1407424.1

demeanor and direct communication methods are praised as "passionate leadership" rather than being labeled as inappropriate or unprofessional.

313.    Bobby Hurley (men's basketball) commonly uses direct communication styles and demanding performance expectations that, when employed by female coaches, are often mischaracterized as "toxic" or "abusive." His animated courtside behavior and vocal criticism of players and officials are deemed appropriate "coaching intensity" rather than misconduct.

314.    Willie Bloomquist (baseball) implements consequences for performance issues without those actions being labeled as "targeting" or "creating a toxic environment." His disciplinary approach, including benching underperforming players and confrontational meetings, is characterized as "holding players accountable" rather than misconduct.

315.    Zeke Jones (wrestling) maintains demanding coaching standards with physical training regimens and direct criticism that would be scrutinized if implemented by a female coach. His intense practice environments and direct feedback are characterized as "excellence-focused" rather than "creating a hostile environment."

316.    Greg Powers (ice hockey) employs vocal criticism and emotionally charged motivational techniques during games and practices without facing the same level of scrutiny that would be applied to female coaches using identical methods.

1407424.1

317.    Matt Thurmond (men's golf) implements strict performance-based standards and direct criticism that, when used by female coaches of women's teams, are often reinterpreted as "harsh" or "inappropriate."

318.    Matt Hill (men's tennis) utilizes direct performance feedback and animated sideline coaching that would be characterized differently if exhibited by a female coach in an identical situation.

319.    Dion Miller (track and field) oversees both men's and women's programs, implementing consistent standards across both teams without facing gender-based critique. His demanding workouts, direct criticism, and raised voice during competition—methods comparable to behaviors for which female coaches are criticized—are characterized as "high standards" rather than misconduct.

320.    The key comparison is not that these male coaches engage in inappropriate behavior, but rather that standard coaching practices (clear performance expectations, direct communication, and accountability measures) are interpreted differently when employed by female versus male coaches.

321.    Particularly telling are coaches who work with both men's and women's teams, who find that identical coaching behaviors elicit different responses based on athlete gender. Female athletes, due to socialization creating different expectations of women in authority, may interpret standard coaching behaviors differently from male athletes. However, ASU's response to these differential perceptions fails to account for gender socialization's role.

322.    Male coaches of women's teams receive greater latitude than female coaches of women's teams:

- Graham Winkworth (women's soccer) employs direct criticism and demanding conditioning yet receives consistent administrative support despite occasional complaints similar to those made against female coaches.
- JJ Van Niel (women's volleyball) uses direct communication and performance-based feedback characterized as "passionate" rather than "negative," despite employing methods similar to those alleged against female coaches.
- Jay Santos (women's gymnastics) implements physically demanding training and direct criticism interpreted as "motivational" rather than "targeting" or "disrespectful," despite mirroring behaviors for which female coaches face scrutiny.
- Ryan Ray (cross country) and Herbie Behm (swimming and diving) utilize coaching methods that include direct criticism and demanding performance expectations that are viewed as appropriate coaching techniques, while identical approaches from female coaches are mischaracterized as inappropriate or unprofessional.

323.    This differential treatment based on coach gender constitutes direct evidence of gender discrimination. Complaints against male coaches are addressed with the presumption of appropriate methodology and administrative support, while complaints against female coaches are presumed valid and result in immediate suspension, investigation, and potential termination without adequate opportunity to respond.

324.    The gender disparity is clearly reflected in the university's coaching demographics, where only 5 of 20 head coaches (25%) are female, despite the university having numerous women's teams. This underrepresentation further reinforces the differential standards applied to male versus female coaches.

**FIRST CAUSE OF ACTION**
**Violations of Title VII**
**(Gender Discrimination, Hostile Work Environment, Pay Discrimination and Retaliation)**

325.    Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

326.    Coach Tomasevic has satisfied all administrative requirements and conditions precedent for bringing suit under Title VII on this claim.

327.    Under the provisions of Title VII, it is unlawful for an employer to discriminate against an employee on the basis of sex or to retaliate against her for engaging in activity protected by Title VII.

328.    At all times, Defendant was an "employer" within the meaning of Title VII.

329.    Defendant's conduct against Coach Tomasevic was discriminatory because Defendant failed to treat her equally to male coaches, allowed her to be discriminated against by her supervisors, subjected her to different and heightened scrutiny at work, held her to different and higher standards, and retaliated against her for engaging in conduct protected by Title VII, all in violation of Title VII.

330.    Defendant discriminated against Coach Tomasevic on the basis of gender in violation of Title VII by holding her to a different standard than similarly situated men in the terms and conditions of her employment, including terminating her from her position.

331.    Defendant required Coach Tomasevic, and all female coaches at the University to live within a segregated system. A system that requires them to work harder, manage the feelings of their athletes more carefully, and walk the line between feminine and masculine

53

coaching methods. These expectations are not required of male coaches. These expectations are not part of the job of Head Coach and caused Coach Tomasevic, (and every other female coach) to do far more work for the same or less pay. This is pay discrimination as the lower pay or the extra work required to justify that pay is based on the gender of the coach or the gender of the team she coaches.

332.    On information and belief, in so violating Title VII, Defendant acted in reckless disregard of Coach Tomasevic's rights under Title VII.

333.    As a result of Defendant's conduct, Coach Tomasevic suffered loss of employment, loss of wages and benefits, emotional pain and suffering, humiliation, embarrassment, inconvenience, damage to her reputation, loss of career, and out-of-pocket expenses.

334.    The actions of Defendant also require the imposition of specific equitable and injunctive relief necessary to enforce the mandates of Title VII, including reinstatement, front pay, training, oversight of the athletic department and ASU generally to ensure gender equity throughout the University, and any other equitable relief deemed appropriate by the Court.

## SECOND CAUSE OF ACTION
### Violation of Title VII
### Illegal Segregation and Limitation on the hiring and Retention of Women

335.    Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

336.    Title VII makes it illegal to discriminate, but also to segregate or limit the recruiting, hiring, or opportunities for women in any job category.

337. Defendant has engaged in unlawful segregation by precluding the hiring of women to coach men and has participated in the unlawful limitation on the hiring of women to coach other women.

338. ASU's practice of illegal segregation continues to this day, as ASU has employed zero females to coach men and yet fully supports and hires men to coach women.

339. The fact that Coach Tomasevic has not applied to coach men is a product of the patterns of discrimination affecting her and all women and is a direct result of *de facto* segregation that discourages females from even thinking of seeking a coaching position for male teams.

340. To the extent that Coach Tomasevic cannot recover damages from the direct segregation of women coaching men, the effects of ASU's practice of illegal segregation is to encourage and continue stereotypes in every person participating in ASU athletics.

341. ASU's practice of illegal segregation is proof of the underlying claims of discrimination (Counts I and II) and is further evidence that ASU has knowledge of the extreme risk of gender stereotypes affecting women in college athletics and of the need to exercise due care in the response to complaints about a female coach.

342. ASU's continued practice of enforcing illegal segregation is evidence of discrimination per se under Title VII (Count I) and of negligence per se (Count III).

343. As a proximate result of Defendant's actions, Plaintiff has in the past and will in the future suffer injuries and damages as set forth above.

1407424.1

344.    Defendant acted with deliberate indifference and willful and wanton disregard to Coach Tomasevic's federally protected rights.

345.    As a result of Defendant's actions, Coach Tomasevic seeks monetary damages including, but not limited to, economic damages, career loss, and damages for the indignity and humiliation of being retaliated against.

### THIRD CAUSE OF ACTION
### Violation of Title VII
### (Negligent Discrimination in Violation of Title VII)

346.    Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

347.    Defendant has a duty imposed by Title VII to avoid the foreseeable risks of gender stereotyping.

348.    Defendant has knowledge of these risks via its own policies and training.

349.    Defendant also participates in *de facto* segregation of women and has made no efforts to recruit or hire women to coach men.

350.    Defendant has a duty of care to prevent harm from gender stereotyping. This duty applies to this Defendant in this industry (athletics) and this profession (college coaching).

351.    ASU's practice of illegal segregation is evidence that ASU has actual knowledge of the extreme risk of gender stereotypes affecting women in college athletics and is constructive knowledge of this risk as a matter of law.

352.    As a proximate result of Defendant's actions, Plaintiff has in the past and will in the future suffer injuries and damages as set forth above.

56

353.    Defendant acted with deliberate indifference and willful and wanton disregard to Coach Tomasevic's federally protected rights.

354.    As a result of Defendant's actions, Coach Tomasevic seeks monetary damages including, but not limited to, economic damages, career loss, and damages for the indignity and humiliation of being retaliated against.

## FOURTH CAUSE OF ACTION
### Spoliation of Evidence and Failure to Collect and Preserve

355.    Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

356.    Arizona State University had a legal duty to collect and then preserve evidence relevant to Coach Tomasevic's claims upon receiving notice of potential litigation.

357.    Arizona State University was placed on notice of potential legal claims through multiple channels, including Coach Tomasevic's initial complaints of gender discrimination during her employment, the EEOC complaint, and a detailed letter from Coach Tomasevic's counsel dated March 21, 2023.

358.    On December 10, 2024, Coach Tomasevic's counsel sent a formal, detailed preservation notice to Defendant's counsel explicitly identifying eleven specific categories of documents requiring preservation that would have exposed the double standards applied to female coaches, the added work burden placed on female coaches due to gender stereotypes, Arizona State University's participation in illegal gender segregation, and the differential treatment of male and female athletes experiencing similar coaching methods.

1407424.1

359. Despite requesting confirmation that preservation steps were taken, there has been no response from ASU, and such silence suggests a failure to comply that threatens the integrity of the available evidence including the collection of comparator evidence.

360. Arizona State University's assumed failure to preserve critical documentation has resulted in the spoliation of evidence that would have further demonstrated the differential treatment of female coaches based on gender stereotypes, gender socialization effects, and the resulting double standards applied to Coach Tomasevic.

361. If spoliation has occurred, Coach Tomasevic is entitled to appropriate evidentiary sanctions, including adverse inferences regarding the content of the missing documentation.

**FIFTH CAUSE OF ACTION**
**Pattern and Practice of Discrimination in Violation of Title VII**

362. Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

363. Title VII prohibits employers from engaging in a pattern or practice of discrimination such that discrimination becomes the standard operating procedure---the regular rather than the unusual practice. Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 336 (1977).

364. Defendant Arizona State University has engaged in a pattern and practice of gender discrimination that extends beyond Plaintiff's individual case to affect female coaches throughout ASU's athletic department and across the Arizona public university system.

365. This pattern and practice of discrimination is evidenced by:

    a.    The systematic exclusion of female coaches from men's teams at ASU, as demonstrated by the complete absence of female head coaches for men's teams and the minimal representation of female assistant coaches for men's teams (only 2 out of 33);

    b.    The consistent pattern of gender segregation across all public universities in Arizona;

    c.    The application of different standards to evaluate female coaches compared to male coaches, as demonstrated by the treatment of Coach Tomasevic compared to male coaches all of whom use coaching methods identical to or more demanding than those that resulted in Coach Tomasevic's termination;

    d.    The recurring implementation of flawed investigation procedures that fail to screen for gender stereotype effects, as demonstrated in Coach Tomasevic's case and reflected in the systematic pattern of female coach exclusion; and

    e.    The University's deliberate indifference to the known effects of gender socialization on athlete reporting behaviors, creating a system where coaches of female teams face heightened scrutiny regardless of their actual coaching methods.

366.    This pattern and practice is not limited to individual decision-makers but represents the standard operating procedure throughout ASU's athletic department and administration, creating a system where discrimination has become the regular rather than the unusual practice.

367.    The statistical evidence of the exclusion of women from coaching men's teams, combined with the qualitative evidence of differential treatment of female coaches, establishes a prima facie case that discrimination is ASU's standard operating procedure with respect to the employment of coaches.

368.    ASU's participation in this pattern of discrimination is not a coincidence or the result of isolated decisions but reflects a systemic, institutional commitment to maintaining gender segregation and differential standards based on gender.

369.    As a direct and proximate result of ASU's pattern and practice of discrimination, Plaintiff has suffered damages including loss of employment, loss of income, damage to her professional reputation, and emotional distress.

370.    Plaintiff seeks all remedies available under Title VII for pattern and practice discrimination, including injunctive relief to reform ASU's discriminatory practices, back pay, front pay, compensatory damages, attorneys' fees, and costs.

## SIXTH CAUSE OF ACTION
**Request for Mandatory Injunctive Relief to Eliminate Gender Segregation in Coaching**

371.    Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

372.    Defendant Arizona State University has engaged in and continues to engage in illegal gender segregation in its athletic coaching positions, creating a system that effectively bars women from coaching men's teams while allowing men unrestricted access to coaching positions for both men's and women's teams.

373.    This segregation violates Title VII's prohibition against limiting, segregating, or classifying employees in any way that would deprive any individual of employment opportunities because of sex. 42 U.S.C. § 2000e-2(a)(2).

1407424.1

374.    This segregation also creates a systemic burden on female coaches, requiring them to engage in additional work to navigate the double bind of gender stereotypes, while no similar burden is placed on male coaches.

375.    The ongoing harm of this segregation constitutes a continuing violation of federal and state anti-discrimination laws for which injunctive relief is both appropriate and necessary.

376.    To satisfy the requirements for injunctive relief under Arizona law, Plaintiff must demonstrate: (1) irreparable harm; (2) a reasonable probability of ultimate success on the merits; (3) the absence of an adequate remedy at law; and (4) that the balance of hardships favors the party seeking the relief. *Crowe v. De Gioia*, 90 N.J. 126, 132-34 (1982).

377.    Similarly, under federal law, to obtain a permanent injunction, Plaintiff must demonstrate: (1) that she has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

378.    Plaintiff satisfies all requirements for injunctive relief:

> a. **Irreparable Harm**: The gender segregation in athletic coaching positions at Arizona State University causes irreparable harm to Plaintiff and all female coaches by perpetuating stereotypes, creating barriers to advancement, imposing additional work burdens, and limiting career opportunities. These harms cannot be fully remedied through monetary compensation alone.

61

b. **Likelihood of Success on the Merits:** As detailed throughout this Complaint, the evidence of gender segregation and its discriminatory effects is substantial and compelling. The statistical disparities in hiring, coupled with the documented stereotyping and differentiated treatment of female coaches, demonstrate a strong likelihood of success on the merits of Plaintiff's claims.

c. **Inadequacy of Legal Remedies:** While monetary damages may partially compensate Plaintiff for past discrimination, they cannot prevent the ongoing and future harm caused by the continued practice of gender segregation in coaching. Only structural reform through injunctive relief can eliminate the systemic discrimination perpetuated by the current segregated system.

d. **Balance of Hardships:** The balance of hardships weighs heavily in favor of granting injunctive relief. Plaintiff and other female coaches suffer substantial career limitations, stereotyping, and added work burdens under the current system, while Defendant would face minimal hardship in implementing reforms to eliminate gender segregation in coaching.

e. **Public Interest:** The public interest strongly favors eliminating discriminatory practices in educational institutions, particularly those receiving federal funding. Gender equality in coaching roles serves the public interest by providing equal employment opportunities and diverse role models for student-athletes.

379.     Plaintiff requests that this Court issue a mandatory injunction requiring Arizona State University to implement a comprehensive plan to eliminate gender segregation in coaching positions, modeled after evidence-based approaches that effectively address pipeline barriers and systemic discrimination.

380.     The requested injunctive relief should include, but not be limited to, the following evidence-based components:

a. **Comprehensive Assessment and Accountability System:** i. Conducting a thorough audit of current coaching demographics

and hiring practices ii. Establishing data collection systems to track progress iii. Creating accountability measures with meaningful consequences for failure to meet diversity benchmarks iv. Implementing annual reporting requirements on progress toward eliminating segregation

b. **Formalized Entry Program Implementation:** i. Creating paid fellowship positions that provide female coaches experience with men's teams ii. Reforming graduate assistant positions to include minimum requirements for diversity in men's programs iii. Developing standardized interview protocols that reduce implicit bias in selection iv. Implementing blind first-round application reviews where gender and name are removed

c. **Career Development Infrastructure:** i. Establishing a cross-institutional mentorship network pairing aspiring female coaches with established coaches ii. Providing technical certification and professional development opportunities specifically targeting female coaches iii. Creating coaching exchange programs for brief immersion experiences iv. Developing leadership programs specifically designed to prepare women for head coaching positions

d. **Hiring Practice Reform**: i. Establishing minimum standards for diverse candidate pools for all coaching positions ii. Implementing diverse hiring committees with training on bias recognition iii. Creating policies requiring qualified female candidates to be interviewed for positions on men's teams iv. Developing standardized, competency-focused interview protocols that minimize the impact of stereotypes

e. **Compensation and Retention Reforms:** i. Conducting equity audits of coaching compensation ii. Establishing transparency in contract terms iii. Creating retention incentives for female coaches, particularly in men's programs iv. Implementing family-friendly policies including parental leave and childcare support

f. **Culture Change and Visibility Initiatives:** i. Creating media strategies highlighting female coaches in men's programs ii. Developing recognition programs for coaching excellence regardless of gender iii. Implementing educational programs for

63

male student-athletes on working with female coaches iv. Establishing feedback mechanisms for coaches that control for gender bias

g. **Protection Paradox Mitigation:** i. Implementing multi-method assessment approaches beyond self-reported concerns ii. Establishing gender-responsive support systems with multiple entry points iii. Providing education on gender biases in reporting and response iv. Creating standardized response protocols for athlete concerns that ensure consistent evaluation regardless of athlete or coach gender

h. **Investigation Methodology Reforms:** i. Requiring incident specificity and factual verification for all coaching complaints ii. Implementing comparative analyses between similar behaviors from male versus female coaches iii. Training investigators to identify stereotype effects in complaint formation iv. Developing protocols to distinguish between actual misconduct and gender-biased perceptions of normal coaching

381. The implementation of such injunctive relief is within this Court's authority under both Title VII (42 U.S.C. § 2000e-5(g)) and Title IX, which provide courts with broad discretion to order "such affirmative action as may be appropriate" to remedy discriminatory practices.

382. Arizona courts likewise have broad equitable powers to grant injunctive relief to eliminate discriminatory practices under the Arizona Law Against Discrimination, N.J.S.A. 10:5-1 et seq.

383. The requested injunctive relief is narrowly tailored to address the specific forms of discrimination identified in this Complaint, is based on evidence-based approaches to eliminating gender segregation in coaching, and imposes reasonable and achievable requirements on Defendant.

384.    Without such injunctive relief, the illegal segregation will continue unabated, perpetuating stereotypes, limiting opportunities for female coaches, and maintaining the added work burden on women in coaching positions at Arizona State University.

385.    The requested injunctive relief would not only remedy the harm to Plaintiff but would establish Arizona State University as a leader in eliminating one of the last remaining forms of overt gender segregation in American society, serving both the public interest and the University's educational mission.

386.    Plaintiff further requests that this Court retain jurisdiction to monitor compliance with the injunctive relief and to modify the injunction as necessary to ensure its effectiveness in eliminating gender segregation in coaching at Arizona State University.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Sanja Tomasevic requests judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages; reinstatement; lost wages and benefits; compensatory damages for loss of employment; emotional pain and suffering; indignity; humiliation; embarrassment; inconvenience; damage to her reputation; loss of career; out-of-pocket expenses; punitive damages; equitable relief; and any other relief the Court deems just and necessary to make Plaintiff whole and effectuate the purposes of Title VII; prejudgment and post-judgment interest as allowed by law; attorneys' fees; expert witness fees; and costs.

1407424.1

The actions of Defendant also require the imposition of specific equitable and injunctive relief necessary to enforce the mandates of Title VII, including, but not limited to:

a.  Ordering ASU to reinstate Sanja Tomasevic to her position as head coach of the women's volleyball team;

b.  A mandatory injunction that requires Defendant to begin recruiting and hiring women to coach men in assistant and head coaching positions;

c.  An injunction that requires Defendant to collect data on the responses to standard coaching by male and female athletes;

d.  Training on the removal of implicit bias and gender stereotypes from the assessment of female students and female coaches;

e.  A public statement that clears Sanja Tomasevic from any suggestion that she engaged in any violation of policy or coaching standards;

f.  Such other and further relief as needed to make Sanja Tomasevic whole.


RESPECTFULLY SUBMITTED this 9th day of May, 2025.

SHIELDS PETITTI & ZOLDAN, PLC

By: */s/ Michael D. Zoldan*
Michael D. Zoldan - 028128
mdz@shieldspetitti.com
5090 N 40th St, Suite 207
Phoenix AZ 85018
Tel: (602) 718-3330

1407424.1

NEWKIRK ZWAGERMAN, P.L.C.

*By: /s/ Thomas Newkirk*
Thomas Newkirk
IA Bar No.  AT0005791
tnewkirk@newkirklaw.com
3900 Ingersoll Ave, Suite 201
Des Moines, IA  50312
Tel: (515) 883-2000
*Pro Hac Vice Forthcoming*

Attorneys for Plaintiff

1407424.1